```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION


MARY COMBS,                     )
                                )
          Plaintiff,            )
                                )
     v.                         )   No. 4:05 CV 915 DJS
                                )                   DDN
JO ANNE B. BARNHART,            )
Commissioner of                 )
Social Security,                )
                                )
          Defendant.            )
```

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying plaintiff Mary Combs's application for supplemental security income insurance benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. The action was referred to the undersigned United States Magistrate Judge for a recommended disposition under 28 U.S.C. § 636(b). A hearing was held January 23, 2006.

### I. Background

#### A. Plaintiff's application and medical records

In an application for benefits dated April 17, 2003, plaintiff alleged she became disabled on August 8, 2001 on account of physical and mental impairments. She reported taking Roxicet,[1] Tramadol,[2] Zoloft,[3]

---

[1] Roxicet is a medication used to treat moderate to severe pain. It is a combination narcotic and nonnarctotic. Webmd.com/drugs. (Last visited July 11, 2006.)

[2] Tramadol is a pain reliever. Webmd.com/drugs. (Last visited July 11, 2006.)

[3] Zoloft is an antidepressant used to treat depression, panic attacks, obsessive compulsive disorder, social anxiety disorder, and severe premenstrual syndrome. Webmd.com/drugs. (Last visited July 11, 2006.)

Albutrol,[4] Trazodone,[5] Atenolol,[6] hydrocodone,[7] Flonase,[8] Patanol,[9] and using a CPAP machine[10] for her disabilities. (Tr. 61, 68-69.)

Plaintiff reported working at Xentel as a telemarketer from June 2000 until November 2000. She worked at 7-11 from September 1999 until March 2000, and she took inventory and greeted customers. She worked at Merb's Candies from October to November 1999. Her duties included taking candies off the assembly line, and she was a cashier. She did a variety of jobs at Labor Ready from January 1999 to February 2001, including sorting trash, housekeeping, and sorting items at Goodwill. (Tr. 73.)

On April 25, 2003, plaintiff completed a pain questionnaire. She reported constant throbbing pain, every day, in her knees, feet, and lower back. She said this pain had been present for four months. She reported the medication she takes for the pain makes her sleepy. Plaintiff reported shortness of breath, and that it was difficult to move, do household chores, and to walk or stand due to heel spurs. She

---

[4]Albuterol is used in the treatment of asthma, chronic bronchitis, and emphysema. Webmd.com/drugs. (Last visited July 11, 2006.)

[5]Trazodone is used to treat depression, anxiety disorder, sleeplessness, tension, or chronic pain. Webmd.com/drugs. (Last visited July 11, 2006.)

[6]Atenolol is a beta-blocker used to treat chest pain and high blood pressure. Webmd.com/drugs. (Last visited July 11, 2006.)

[7]Hydrocodone is used to treat symptoms caused by the common cold, flu, allergies, hay fever, or other breathing illnesses. Webmd.com/drugs. (Last visited July 11, 2006.)

[8]Flonase is used to relieve allergy symptoms such as itching, runny or stuffy nose, postnasal drip and sneezing. Webmd.com/drugs. (Last visited July 11, 2006.)

[9]Patanol is an antihistamine used to treat itching and redness in the eyes due to allergies. Webmd.com/drugs. (Last visited July 11, 2006.)

[10]Continuous positive airway pressure (CPAP) is a machine which helps a person who has sleep apnea breathe more easily during sleep. It increases the air pressure in the throat so the throat does not collapse during breathing. Webmd.com/hw/sleep_disorders/hw48752.asp. (Last visited July 11, 2006.)

puts a heating pad on her back and Bengay wraps on her knees.(Tr. 79-80.)

Plaintiff reported having a friend do her household chores for her, and that she cannot sleep without her CPAP machine. She reports that her pain makes it take longer to shower and do other personal hygiene habits. She cooks simple meals. She has no difficulty following directions. She requires help shopping and carrying in groceries, although she used to be able to do everything herself. She reads to keep her mind occupied. She leaves her home four times a month to go to the doctor, to the store, or to see her social worker. It is difficult for her to walk to the bus stop. (Tr. 81-82.)

On January 24, 2002, plaintiff visited Eric Blum, M.D. She complained of an achy throat and drainage. She was also concerned with hair loss. He suggested she reduce her use of styling products. She was also interested in birth control. He noted she was going to see a dietician for her obesity and advised her to start exercising. (Tr. 168-69.)

On January 24, 2002, plaintiff visited with Holly Miller, a dietician. She noted plaintiff consumed excess calories, mostly from soda and snacks. They discussed permanent lifestyle changes, such as portion control and not skipping meals. (Tr. 170.)

On September 26, 2002, plaintiff visited Dr. Blum. Plaintiff complained of heel spurs, chronic allergies, asthma, and morbid obesity. X-rays revealed the bone spurs. She had itchy, watery eyes, and drainage. She was diagnosed with hypertension and morbid obesity. (Tr. 164-67.)

On September 27, 2002, radiologist Juliet P. Fallah, M.D., performed a chest x-ray on plaintiff. Her lungs were clear, and cardiac images were normal. There was minimal elevation of the left hemidiaphragm,[11] and the x-ray revealed an old healed rib fracture. (Tr. 172.)

---

[11]The hemidiaphragm is half of the diaphragm, or the muscle that separates the chest cavity from the abdomen and serves respiration. Www. medterms.com/script/main/art.asp?articlekey_34231. (Last visited July 11, 2006.)

On October 10, 2002, plaintiff visited Dr. Blum. She had no complaints since the last visit. Plaintiff showed interest in gastric bypass surgery. (Tr. 161.)

On December 4, 2002, plaintiff underwent a CPAP study at Washington University Sleep Disorders Laboratory, by Hrayr Attarian, M.D. It was noted that during 2.2 hours of sleep, plaintiff had several arousals from sleep, mostly due to breathing problems. Her sleep efficiency was improved with the use of the CPAP. She was diagnosed with severe obstructive sleep apnea. (Tr. 143-44.)

On December 23, 2002, plaintiff visited Dr. Blum. He noted she had participated in a sleep study and felt more rested since using the CPAP. She was able to move around and do household chores and it was a "dramatic improvement." She was referred to Dr. Eagan for a consultation for gastric bypass surgery. She was also given a referral for tattoo removal, and was given a flu vaccine. It was noted her hypertension was well controlled by the medication. (Tr. 157-59.)

On April 4, 2003, plaintiff visited Dr. Blum, concerning her itchy eyes, runny nose, sneezing, knee pain, and back pain. Her back pain was relieved by lying down. (Tr. 154.)

On April 15, 2003, plaintiff had an x-ray performed on both of her knees by Louis A. Gilula, M.D., radiologist. There was no fracture or dislocation seen, and no degenerative changes. Her impressions was normal. (Tr. 171.)

On April 29, 2003, plaintiff visited Hemavathy Parthasarathy, M.D., for a psychiatric assessment. She was diagnosed with major depressive disorder, morbid obesity, asthma, and hypertension. She was coping with the stress of multiple medical problems and losing the custody of her children. She was assessed a GAF of 50.[12] She reported being in an abusive relationships, and losing custody of all eight of her children either to adoption or foster care. She was groomed, and was polite and

---

[12] A Global Assessment of Functioning score of 50 indicates "**serious symptoms** (e.g., suidical ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep job)." Diagnostic and Statistical Manual of Mental Disorders (4th ed.) (DMS-IV).

-4-

cooperative during the interview, making good eye contact. She was alert and oriented, and had good memory. She had a fair grasp of general knowledge. She was to return in four weeks. (Tr. 149-52.)

On April 17, 2003, SSA Interviewer Steve Yates performed a face-to-face interview with claimant. He thought she had no problems hearing, reading, breathing, understanding, being coherent, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing. He noted she was a very large woman, over six feet tall and weighing over 400 pounds. She was coherent and had normal behavior, but did not appear very well groomed. (Tr. 120-22.)

On June 5, 2003, plaintiff visited Elbert H. Cason, M.D., complaining of being overweight, asthma, sleep apnea, and feet, knee, and back problems. Plaintiff reported getting two asthma attacks per year. Her CPAP machine helps her sleep considerably. Her weigh aggravates her knees and her x-rays showed no evidence of arthritis. She was told to get shoe inserts for her heel spurs but had been unable to do so. She could not heel toe stand, or squat. No walking assistance device was needed. Her grip strength was normal, and she could make a fist and fully extend her hands. She was able to use her fingers to button and write. She appeared alert and oriented. Her lungs were clear, and there was no evidence of a neurological abnormality. (Tr. 173-76.)

On June 27, 2003, an x-ray of plaintiff's back, read by James A. Junker, M.D., showed a mild narrowing of the L5-S1 disc space without associated sclerosis. The L2-3 and L3-4 were mildly narrowed, and all other spaces were well preserved. There was narrowing at T11-12, L2-3, L3-4, and L5-S1. (Tr. 178.)

On July 17, 2003, Tamara Kastanas, D.D.S., performed a physical residual functional capacity assessment on plaintiff. Plaintiff was found to be able to lift 50 pounds occasionally, 25 pounds frequently, stand or walk for two hours in an eight hour workday, and to sit for six hours in an eight hour workday. She was unlimited in her ability to push or pull. Plaintiff could occasionally climb ramps and stairs, balance, kneel, crouch, or crawl, could frequently stoop, and could never climb ladders, ropes or scaffolds. She has no manipulative,

-5-

visual, or communicative limitations.  She was to avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation, due to her asthma.  (Tr. 105-13.)

On July 22, 2003, Aine Kresheck, Ph.D, performed a consultive mental RFC assessment on plaintiff.  Dr. Kresheck opined that plaintiff was not significantly limited in her ability to remember locations and work-like procedures; to understand and remember simple instructions; to carry out simple instructions; to perform activities within a schedule; maintain regular attendance; to be punctual; to interact appropriately with the general public; or to respond appropriately to changes in work settings.  Dr. Kresheck found that plaintiff was moderately limited in her abilities to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination and proximity to others without being distracted by them; to accept instructions and respond appropriately to criticism; and to get along with coworkers.  Dr. Kresheck opined that plaintiff had no limitations sustaining an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions; maintain socially appropriate behavior; be aware of normal hazards, travel to unfamiliar places, or to set realistic goals.  Dr. Kresheck noted that "[d]espite her mental impairments, claimant retains the ability to perform simple repetitive work in a work environment not requiring high levels of social interaction."  (Tr. 87-89.)

On July 22, 2003, a psychiatric review technique form was completed by Dr. Kresheck.  Dr. Kresheck found that plaintiff had anhedonia, or pervasive loss of interest in most activities, decreased energy, and thoughts of suicide.  Dr. Kresheck opined she had mild restrictions of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and that there was insufficient evidence of decompensation.  Dr. Kreshneck noted that plaintiff was married, had eight children by five different men, and had spent 19 months in a workhouse after being accused of raping her oldest son.  Plaintiff had a history of sexual

abuse.  She was prescribed Prozac[13] and Trazadone and told to return in four weeks, but it was noted later she did not do so.  (Tr. 91-103.)

On September 29, 2003, plaintiff visited Chandrashekar Reddy, M.D., MPH, who diagnosed her with major depression.  Dr. Reddy prescribed Prozac and Trazodone.  (Tr. 196.)

On October 9, 2003, plaintiff visited Dr. Blum.  She complained of knee pain.  Dr. Blum noted the April 2003 x-ray of her knee showed no abnormality.  He referred her to an orthopedist for an opinion, and he prescribed Percocet[14] and Tramadol.  (Tr. 203.)

On December 16, 2003, Dr. Reddy diagnosed plaintiff with major depressive disorder, and a GAF of 60.[15]  He discontinued her Prozac because she was not responding and started her on Zoloft.  (Tr. 200.)

On February 18, 2004, plaintiff visited Dr. Reddy.  She said she felt better on Zoloft.  Her mood was improved, her energy level was improved, and so was her concentration.  She was normally groomed, cooperative, had good eye contact, and spoke at a normal rate, volume, and tone.  He increased her prescription of Zoloft and told her to continue Trazodone.  He diagnosed her with major depressive disorder, and a GAF of 60.  (Tr. 195, 197.)

On February 20, 2004, plaintiff visited an emergency room complaining of an asthma attack and pain in her right knee.  She arrived via ambulance.  She described the pain as an eight on a 10-point scale. (Tr. 185-94.)

On March 18, 2004, Carol King, Asthma Coordinator at Catholic Family Services, wrote in a letter that plaintiff suffered from weight issues that caused her hypertension, leg and joint pain, and depression.

---

[13]Prozac is an antidepressant, specifically a selective serotonin reuptake inhibitor (SSRI) used to treat depression, obsessive-compulsive disorder, panic attacks, and certain eating disorders.  Webmd.com/drugs. (Last visited July 11, 2006.)

[14]Percocet is a combination narcotic and non-narcotic used to treat moderate to severe pain.  Webmd.com/drugs.  (Last visited July 11, 2006.)

[15]A GAF score of 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.  DSM-VI.

She wrote that plaintiff's weight affected her asthma management. (Tr. 74.)

## B. Testimony of Plaintiff

At a hearing held May 25, 2004, plaintiff testified that she lived with her friend, Judy Doerr, in an apartment. She was born March 6, 1971 and was 33 years old as of the hearing date. Plaintiff testified that she had her GED, and had one semester of community college that she completed in spring 2004. She began the semester taking four classes, but dropped one to avoid a bad grade on her transcript. The three classes she completed were math, sociology, and human services. (Tr. 237-38.)

Plaintiff testified that she did not have any income currently, but paid her rent with Section 8 income and paid other bills with church charity. She testified she receives $141 per month in food stamps and had Medicaid coverage. She testified that Medicaid would cover gastric bypass surgery but she was having trouble finding a doctor that would perform the surgery. (Tr. 238-39.)

Plaintiff testified that she was married but separated. She has children but they do not live with her. (Tr. 240.)

Plaintiff testified that the last job she held was a telemarketing position. She sold tickets for charity events for firefighters and police. She used a computer that automatically dialed numbers, and she would try to sell tickets. She would also verify the amount of tickets others sold. She worked at this job for six months. She felt she learned the job but that it was stressful, and she often did not want to go to work. She testified the people would curse at her, and she quit. She did not do any heavy lifting at this job. (Tr. 240, 244.)

Plaintiff testified that prior to her telemarketing job, she worked at a candy store packaging candy, but that it was only seasonal work. She had to stand up and lift 50-pound trays of apples. She also worked at 7-11 as a cashier, and this job required her to do a variety of jobs, including making coffee and stocking shelves. She left that job because the store shut down and no employees were transferred to other stores.

The most she lifted was five pounds while working at 7-11. (Tr. 241-42, 44.)

Plaintiff also testified that she worked at Labor Ready doing a variety of odd jobs at various locations. One such job was at a recycling plant where she sorted glass, bottles, plastic, and paper for two days. She would lift up to 50 pounds. She testified most of her jobs were physical. (Tr. 242-44.)

Plaintiff testified that the main reason she cannot work is because of her depression, which she cannot get under control. She cannot stand or sit for an extended period of time. She testified that her ankles, knees, and back are in constant pain. She has heel spurs, but that she weighs too much for them to do surgery on them. She said pain medication and laying down helps alleviate this pain a little. Plaintiff testified that her knee pain is due to her weight. (Tr. 345-47.)

Plaintiff testified that she suffers from back pain every day. Pain medication doe not help, and her pain level was a "nine" on a ten-point scale. She uses a heating pad when the pain is a "ten." She also testified that her weight is the cause of her back pain, and that she currently weighs 437 pounds. She had recently lost 30 pounds but she was not sure why. She testified she is six feet, two inches tall. (Tr. 247-49.)

Plaintiff testified that she has tried many times to have gastric bypass surgery, but she is unable to find a doctor who takes Medicaid. One doctor at Barnes-Jewish Hospital who will take Medicaid has a waiting list and is not taking new patients until 2007. (Tr. 249-50.)

Besides her pain, plaintiff testified she also suffers from asthma; she uses an inhaler and has a nebulizer.[16] She is supposed to use the nebulizer three times a day but uses it twice. She has problems breathing every day. She testified doctors have told her that her weight contributes to her breathing difficulties. (Tr. 250-51.)

---

[16]A nebulizer is a breathing machine that changes asthma medicine from a liquid into a mist. Webmd.com/content/article/46/1660_51076.htm. (Last visited July 11, 2006.)

-9-

Plaintiff also suffers from sleep apnea. She has a CPAP machine that helps her breathe at night when her breathing stops. She does not think that it works very well. Plaintiff also testified that her high blood pressure is under control with medication. (Tr. 251-52.)

Plaintiff testified that she suffers from depression, and she has been seeing a doctor for treatment for over a year. She testified she had taken Trazodone and Zoloft, but that she only took the Trazodone one time because she was unable to sleep on it due to bad nightmares. Her depression makes it difficult to get out of bed, and she isolates herself, cries, and does not watch television, read, or do anything. She did not interact with anyone while at school. She cries once or twice a week. (Tr. 252-55.)

Plaintiff testified that her inability to get our of bed sometimes made her miss class. She had to have her mother wake her up for the hearing, and she took her medications and came, although she got lost twice. She testified that she is sometimes late paying bills and filing papers, but that she did not have a problem in school because she had understanding teachers. (Tr. 255-56.)

Plaintiff testified that her friend Judy takes her grocery shopping and to school. She rides a motorized cart when shopping. She does not like to be in crowds in stores. She does the housework but testified that it takes her three hours to clean her one-bedroom apartment. She does the dishes by hand, and does the laundry in the basement. She carries the clothes in two different loads or drags the container behind her. She does no maintenance or yard work. She recently learned to drive but has no license. (Tr. 257-61.)

Plaintiff testified that she does not lift anything if she can avoid it, but can lift a bag of sugar. She has neighborhood kids carry items into the house for her. She can carry a gallon of milk. She does not think she could carry a case of soda, or 20 pounds. (Tr. 261-62.)

Plaintiff testified she can stand for about 20 minutes, and stands to shower and do the dishes. Walking is harder than standing. She can walk about one block, then she has to rest a minute before turning around and returning. She alternates sitting and standing, and can sit for about an hour and can lay down for two hours. (Tr. 262-64.)

Plaintiff testified that she does not have a problem getting along with people, but that she does not want to be around people. Plaintiff attends church on most Sundays, and is there about two hours. She can sew and knit but seldom finishes anything. She reads historic novels. She spent 10 hours a week in school, about two hours per day. Friends and relatives visit her. She does not go to movies or out for dinner because she cannot afford it. (Tr. 265-69.)

### C.  Testimony of Judy Doerr

Judy Doerr testified that she had been plaintiff's friend since 1980, or since they were teenagers. She had lived with plaintiff for two months at the time of the hearing, and before that had seen her every day. She witnessed plaintiff have trouble cleaning her house, such as sweeping and mopping. She testified that she helps plaintiff with the shopping, and that plaintiff has no difficulty doing it because they use the motorized carts. She testified that both she and plaintiff struggle bringing groceries into the house. (Tr. 270-72.)

Doerr also testified that both of them take naps during the day, and that plaintiff lays down three or four times a day. She testified plaintiff does not go out socially. She had witnessed plaintiff cry about once or twice a week. She testified that she did not think plaintiff could work because she just lays and cries during the day because of the pain. Doerr testified that she is also disabled because she is deaf in one ear, wears a hearing aid in the other, has bad asthma and rheumatoid arthritis. She wears an oxygen tank. (Tr. 272-73.)

### D.  Testimony of Vocational Expert

Vocational expert (VE) Michael Brethauer testified at the May 2004 hearing, and was asked this hypothetical question:

> . . .if we had a hypothetical individual with the claimant's age and education, training, past relevant work experience--if the individual were limited to sedentary work with a limitation to lifting and carrying the equivalent of a gallon of milk with no requirement--let's say with an alternate sit/stand option with no requirement to sit more than one hour at one time, no requirement to stand more than 20 minutes at one time, no requirement to walk more than one

block at one time, would there be jobs such a hypothetical
        individual could perform?

The VE testified that there were jobs such an individual could do. (Tr. 275-76.) The VE testified that such a person could do plaintiff's past relevant work of telephone solicitor. If that person was limited to not working closely with other individuals, that person could not do plaintiff's past relevant work. There was other work such a person could do with that additional limitation, such as sedentary security guard, gate guard, doorkeeper, small product assembly, and product inspector. (Tr. 275-77.)

The VE testified that if all of plaintiff's complaints were credible, there would be no work that she could do. (Tr. 278.)

### E. Decision of the ALJ

In a September 23, 2004 decision denying benefits, the ALJ found that plaintiff had the following severe impairments: major depressive disorder, moderate; morbid obesity; history of asthma; essential hypertension; obstructive sleep apnea secondary to obesity; bilateral plantar calcaneal spurs; and multiple arthralgias affecting the back, knees, and feet secondary to excessive weight. The ALJ found that these impairments did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P in Appendix 1. (Tr. 13.)

Citing Polaski v. Heckler, 751 F.2d 943, 948(8th Cir. 1984), the ALJ considered plaintiff's work record and daily activities when determining her credibility. The ALJ noted that plaintiff had a sporadic work history, with minimal or no earnings for many years. He also noted that plaintiff lives in Section 8 housing, church groups pay her utilities, she gets monthly food stamps, receives Medicaid benefits, and lives with a roommate who receives disability benefits. The ALJ opined these facts suggested a lack of motivation to work. (Tr. 14-15.)

The ALJ also considered all of her daily activities, including the housework, laundry, reading, driving, attending church for two hours, visits from friends, attending community college, and shopping. While noting that she need not be bedridden to qualify for benefits, the ALJ thought that her daily activities were inconsistent with being unable

to work. He found her testimony not supported by the medical evidence, as well as the testimony of her roommate. (Tr. 15, 18.)

The ALJ found that plaintiff's hypertension was well controlled by medication. He found that plaintiff's orthopedic complaints were not supported by medical evidence to be as serious as she claimed, that she did not require assistance walking, and that she had not obtained the shoe inserts prescribed by her doctor. She had not undergone ongoing treatment for these complaints. The ALJ found that while her obesity did limit her use of her lower extremities, she was able to perform a variety of household duties. (Tr. 16-17.)

The ALJ noted that the plaintiff had minimal mental health treatment, and there was no record of ongoing psychotherapy, or psychiatric hospitalizations. She was also non-compliant with follow-up for mental health treatment. The ALJ noted that Dr. Reddy thought plaintiff had responded to Prozac, and that she had a GAF of 60, or moderate mental symptoms. The ALJ found she had mild limitations in daily living, and moderate limitations in social functioning. (Tr. 17.)

The ALJ found that plaintiff had the RFC to perform the exertional requirements of sedentary activity, with restrictions that were posed to the VE. The ALJ determined that plaintiff could not return to her past relevant work as a telephone solicitor because it required close interaction with the general public. (Tr. 18.) The ALJ found that she could perform the sedentary jobs suggested by the VE, those of gate guard and doorkeeper. (Tr. 20.)

## II. Discussion

### A. General Legal Framework

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th

Cir. 2000). So long as substantial evidence supports that decision, the court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-41, (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is not disabled at any step, a determination or decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).

Here, the ALJ determined that plaintiff could not perform her past relevant work, but that she could perform sedentary work in the national economy, at Step 5 in the process. The burden shifts to the Commissioner to prove that the plaintiff could perform other work. See Fenton v. Apfel, 149 F.3d 907, 910 (8th Cir. 1998).

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because he failed to properly determine her mental RFC, and the hypothetical question he posed to the VE and then adopted was insufficient. (Doc. 10 at 14.)

### B. Mental RFC

Plaintiff alleges that the ALJ erred by failing to express plaintiff's mental RFC with sufficient specificity and by failing to incorporate all of her restrictions in her RFC in the question to the VE. Specifically, she argues that the ALJ did not properly consider the opinion of Dr. Kresheck, the state agency psychological consultant.

The RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). When

-14-

determining plaintiff's RFC, the ALJ must consider "all relevant evidence" but ultimately, the determination of the plaintiff's RFC is a medical question. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence. Id.; see also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

The ALJ found plaintiff's impairments limited her RFC as follows:

> The undersigned finds that claimant, secondary to her physical condition, is limited to sedentary work with a limitation of carrying no more than the equivalent of a gallon of milk, with the need for an alternate sit/stand option, with no requirement to walk more than 1 block at one time, no requirement to stand more than 20 minutes at one time, and no requirement to sit more than 1 hour at one time. Additionally, the claimant, <u>from a mental standpoint, would be precluded from work involving closer interactions with other people or working around large groups of people</u>, and she has a limitation to working in a relatively clean air environment.

(Tr. 18, emphasis added.)

The ALJ must consider the opinion of a consulting physician, like Dr. Kresheck, because it is relevant evidence, and is to be considered with the record as a whole. See 20 C.F.R. § 416.927(f) ("We consider all evidence from nonexamining sources to be opinion evidence."); Miles v. Barnhart, 374 F.3d 694, 700 (8th Cir. 2004) (while mental RFC must be supported by some medical evidence, "the ALJ must consider all the record evidence.").

Dr. Kresheck opined that plaintiff had mild restrictions of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and found there was insufficient evidence of decompensation. (Tr. 87-103.)

The ALJ discussed at some length plaintiff's mental limitations. (Tr. 17-18.) The ALJ noted that the record indicated major depressive disorder, moderate, that Dr. Reddy noted she had "some" complaints of depression but that plaintiff was neither a threat to herself or others. Dr. Reddy assessed her with a GAF of 60, indicating moderate symptoms. (Tr. 195, 197, 200.) The ALJ used the criteria on the Psychiatric Review Technique form, which Dr. Kresheck also completed. The ALJ determined that plaintiff would have mild limitations of activities of

-15-

daily living, moderate difficulties maintaining social functioning, preventing her from working in closer interaction with others or in large groups. The ALJ also found she had no more than a mild to moderate limitation in maintaining concentration, persistence, and pace, which would not preclude her from entry level work. (Tr. 17-18.)

These findings are in accord with those of Dr. Kreshneck; in fact, they are identical except for the ALJ determining that plaintiff was mildly to moderately limited with concentration, persistence, and pace, instead of moderately limited. But this deviation from Dr. Kresheck's opinion is supported by substantial evidence from the record as a whole. Dr. Kresheck noted that "[d]espite her mental impairments, claimant retains the ability to perform simple repetitive work in a work environment not requiring high levels of social interaction." (Tr. 89.) Further, plaintiff enjoyed reading and attended and completed a semester at community college. These activities support a mild limitation of concentration, persistence, and pace.

There is other substantial evidence supporting the ALJ's findings. Plaintiff's doctors noted she was responsive to anti-depressant medication. She did not maintain constant mental health treatment, which indicates a non-disabling condition. Infrequent doctor visits can indicate that the plaintiff's complaints are not credible. See Buckler v. Bowen, 860 F.2d 308, 311 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987). She had no problems following directions. She attended church for two hours every week and interacted with her roommate. Therefore, plaintiff's mental RFC is supported by substantial evidence.

### C. Subjective Complaints

The ALJ did not err when discrediting the subjective complaints of plaintiff. "The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians . . . ." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Factors to be considered include the claimant's daily activities, the duration, frequency, and intensity of

the pain, any precipitating factors, whether the claimant has been taking pain medication and the dose, and functional restrictions.  Id.; Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003).  The ALJ may not discredit subjective complaints based solely on personal observation. Polaski, 739 F.2d at 1322.  "Subjective complaints may be discounted if there are inconsistencies in the record as a whole."  Singh, 222 F.3d at 452.  "An ALJ who rejects such complaints must make an express credibility determination explaining the reasons for discrediting the complaints."  Singh, 222 F.3d at 452.

The ALJ, while citing Polaski, noted that plaintiff participated in daily activities that were not indicative of disabling pain.  She did her own grocery shopping, did laundry, even carrying multiple loads down steps to the basement, one at a time.  She attended church regularly. She read and attended community college.  No doctor prescribed any walking assistance besides shoe inserts for her feet, which she did not obtain.  Very little medical evidence supported the pain she felt, and x-rays showed no degenerative changes or arthritis in her knees or back. The ALJ also noted plaintiff had a sporadic work history and received much monetary assistance for her living expenses, indicating low motivation to work.

There is substantial evidence on the record to support the ALJ's decision to discredit her subjective complaints of pain.

### D.  VE Hypothetical Question

Plaintiff also argues that the hypothetical question posed to the VE did not properly address her mental limitations.  Nonexertional limitations are any limitations besides strength that reduce a person's ability to work.  Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992).  "[I]f the claimant's nonexertional impairments diminish his or her residual functional capacity to perform the full range of activities listed in the [Medical-Vocational] Guidelines, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's characteristics."  Id.

-17-

"Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." Grissom v. Barnhart, 416 F.3d 834, 837 (8th Cir. 2005) (quoting Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004). "The hypothetical question must include all the claimant's impairments supported by substantial evidence in the record as a whole." However, it does not need to include those impairments that the ALJ does not find credible. Grissom, 416 F.3d at 837 (mental conditions, if supported by the record, must be considered by VE); Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).

Here, the ALJ obtained VE testimony, and the hypothetical question posed to him properly reflected the plaintiff's limitations found by the ALJ.

While the hypothetical question posed to the VE did not contain the limitation of "mild" difficulty with concentration, persistence or pace, the ALJ noted that he believed plaintiff had "no more than a mild to moderate" difficulty in this area, indicating he did not find plaintiff's complaints of difficulties with concentration, persistence, and pace credible or supported by the record. As stated above, the record shows that plaintiff was able to read historic novels and complete a semester of community college, facts which call into question her complaints that she cannot concentrate. Because the ALJ did not find these limitations credible, he did not have to include them in the hypothetical question.

**RECOMMENDATION**

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

```
                              _____
                              DAVID D. NOCE
                              UNITED STATES MAGISTRATE JUDGE
```

Signed on August 17, 2006.